C & K COAL COMPANY; Cambria Coal Company; Shannon Coal Company; W. P. Stahlman Coal Company; and Vantage Coal Company; and Fred L. Myers, Debra M. Campbell, Laura Mays, Sandra K. Towers and Ralph E. Morrison, individually and on behalf of all others similarly situated, Plaintiffs,

v.

UNITED MINE WORKERS OF AMERICA, et al., Defendants.

Civ. A. No. 79–1474.

United States District Court,
W. D. Pennsylvania.

March 17, 1982.

Charles Gibbons, Michael Manzo, Alan Garfinkel, Pittsburgh, Pa., for C & K Coal, Cambria Coal, Shannon Coal Company and W. P. Stahlman Coal.

Lloyd Engle, Jr., Lou Ann Phelps, Pittsburgh, Pa., Willard P. Owens, Washington, D.C., for United Mine Workers of America (International) and Arnold Miller.

Kenneth J. Yablonski, Washington, Pa., for Louis Antal, Pete Sabo, Estel Taylor and John Chach.

Blair Pawlowski, Timothy P. Creany, Ebensburg, Pa., for Dist. 2 of UMWA and Walter Harris.

Bruce McKenrick, Fremont McKenrick, Ebensburg, Pa., for Local 1269, J. J. Taranto and Richard Mulhollen.

Melvin L. Vatz, Pittsburgh, Pa., for Lindsay Cleaver, Norman L. Connor, Jr., Amerigo De Pellegrin, Thomas Eshenbaugh, Jeffrey Lynn Lash, Audley Montgomery, Robert J. Riggatire, Charles E. Ponce, John W. Black, Robert J. Matter, Frank J. Nemeth, Joseph G. Miller, John Doe and Richard Roe.

Louis Kushner, Robert Cohen, Robert Whitehill, Pittsburgh, Pa., for Dist. 5 of UMWA.

David A. Lovejoy, Pittsburgh, Pa., for Locals 6132 and 4426 and Paul D. Michel.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

ZIEGLER, District Judge.

#### I. *Part One—Liability*

(1) This is a civil action for money damages filed by C & K Coal Company, Cambria Coal Co., Shannon Coal Co., W. P. Stahlman Coal Co. and Vantage Coal Co., against the United Mine Workers of America, hereinafter referred to as the International, Districts 5 and 2, Locals 1269, 4426, 6132 and 1362, and 20 officers or members of these labor organizations. The plaintiffs are non-union companies, who are wholly owned subsidiaries of Gulf Resources and Chemical Corp.

▇ (2) The instant litigation arises from events which occurred during the economic strike between the International, the Districts and other Local Unions of the United Mine Workers of America, and the members of Bituminous Coal Operators Association, with whom they had a collective-bargaining relationship. The strike began on December 6, 1977, and ended on March 27, 1978, when a new contract was executed. Plaintiffs are non-union companies located in Western Pennsylvania and did not have, at any time, a collective-bargaining agreement or relationship with defendants. Plaintiffs were not members of the B.C.O.A. and, at no material time, did defendants have a labor dispute with plaintiffs. Plaintiffs are therefore neutral or secondary employers. *See NLRB v. Retail Store Employees Union*, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980); *NLRB v. Fruit and Vegetable Packers*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964).

(3) In Count 1, C & K, Shannon, Stahlman and Vantage have filed suit against the International, Districts 5 and 2, the four local unions and officers Miller, Antal, Sabo, Taylor, Chach, Scarton, Harris, Michel, Taranto, Mulhollen, Matter, Valauri, Black and Ponce, contending that these defendants violated Section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act and Section 303 of the Labor Management Relations Act of 1947, commonly referred to as the Taft-Hartley Act.

(4) Section 303 of that Act provides as follows:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the National Labor Relations Act, as amended.

(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit. 29 U.S.C. § 187 (1976).

(5) Section 8(b)(4) of the National Labor Relations Act provides:

(b) It shall be an unfair labor practice for a labor organization or its agents— (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employ-

er to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

*Provided*, That nothing contained in this sub-section shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees who such employer is required to recognize under this subchapter: *Provided further*, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution; .... 29 U.S.C. § 158(b)(4) (1976).

(6) The Supreme Court formulated the following three-part test to identify a violation of Section 8(b)(4) in *Local 1976, United Brotherhood of Carpenters v. NLRB*, 357 U.S. 93, 98, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186 (1958): ·

Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person.

(7) Recently the Court of Appeals for the Second Circuit, in discussing the reach of Section 8(b)(4), explained:

It has long been recognized that section 8(b)(4) was enacted for the purpose of 'shielding unoffending employers and others from pressures in controversies not their own.' *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 627 [87 S.Ct. 1250, 1259, 18 L.Ed.2d 357] (1951). Balanced against this congressional objective is the 'right of labor organizations to bring pressure to bear on offending employers in primary labor disputes.' *Id.* This competing concern is reflected in the proviso of section 8(b)(4)(ii)(B)—which exempts from the section 'any primary strike or primary picketing'—and in the affirmative protection accorded primary union activity under the NLRA. Thus, unions are protected when engaging in primary activity no matter how severe the impact on neutral employers, *id.*, at 627 [87 S.Ct., at 1259], but are forbidden from pressuring an employer when the pressure is 'calculated to satisfy union objectives elsewhere.' *Id.* at 644, 87 S.Ct. at 1268. *See also NLRB v. Enterprise Association & General Pipefitters*, 429 U.S. 507, 528, 97 S.Ct. 891, 902, 51 L.Ed.2d 1 (1977).

*Allied International, Inc. v. International Longshoremen's Assoc.*, 640 F.2d 1368, 1377 (2d Cir. 1981).

(8) In Count 2, Cambria Coal Company has filed suit against the International, District 2, Locals 1269 and 1368, and officers Miller, Scarton, Harris, Taranto and Mulhollen contending that these defendants violated Section 8(b)(4)(i) and (ii)(B) of Section 303 of the Labor Management Relations Act of 1947.

(9) In Count 3, C & K, Shannon, Stahlman, Vantage and Cambria have filed suit against the 29 defendants appearing in the caption contending that these defendants, and others, conspired to unreasonably restrain interstate commerce, by violence and

intimidation against the non-union mines in the Western District of Pennsylvania including plaintiffs, in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. Plaintiffs also seek treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and counsel fees, interest and costs.

(10) Plaintiffs' anti-trust allegations arise out of a meeting which occurred on December 14, 1977, at the Sheraton Inn at Clarion, Pennsylvania. Plaintiffs contend that defendants conspired to coerce plaintiffs to enter an agreement to restrain trade when defendants offered, and plaintiffs agreed, not to ship coal in interstate commerce during the period of the strike between the United Mine Workers of America and the members of the B.C.O.A.

(11) Section 1 of the Sherman Act provides as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal . . . ."

(12) Section 4 of the Clayton Act provides as follows: "Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any district court of the United States . . . , without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

(13) Count 4 was dismissed by the court against all defendants in its pre-trial bench memorandum dated Dec. 11, 1981.

(14) In Count 5, C & K, Shannon, Stahlman and Vantage have filed a state law claim for tortious interference with a business relationship against the International, Districts 5 and 2, the four locals and 14 officers of these organizations. In this regard Pennsylvania law and the Restatement (Second) of Torts provide:

§ 766A. Intentional Interference with Another's Performance of His Own Contract

One who intentionally and improperly interferes with the performance of a con-

tract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

(15) In Count 6, C & K, Shannon, Stahlman and Vantage have filed a state law claim for the tort of conspiracy against the defendants referred to in the previous finding. In this regard Pennsylvania law provides:

A conspiracy is a combination of two or more purposes to do an unlawful act, or to do a lawful act by unlawful means. One of the essential elements of this tort is that one of the conspirators perform one overt act in furtherance of the conspiracy.

See, 7 P.L.E. 187, Conspiracy § 1, et seq.

(16) In Count 7, C & K, Shannon, Stahlman and Vantage have filed a state law claim for the tort of trespass against the defendants referred to in finding number 14. In this regard, Pennsylvania law and the Restatement (Second) of Torts provide:

§ 158. Liability for Intentional Intrusions on Land

One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally

(a) enters land in the possession of the other, or causes a thing or a third person to do so, or

(b) remains on the land, or

(c) fails to remove from the land a thing which he is under a duty to remove.

(17) In Counts 8, 9, and 10, Cambria Coal Co. has filed similar state law claims against the International, District 2, Locals 1269 and 1368, and 5 officers of these organizations. The state law claims of all plaintiffs in Counts 5–10 seek compensatory and punitive damages, as well as counsel fees and costs.

(18). Jurisdiction of this court is predicated on 29 U.S.C. § 187 with respect to Counts I and II. Jurisdiction is based on 15 U.S.C. § 15 and 28 U.S.C. § 1337 with respect to Count III. Counts 5–10 are pendent state law claims, which this court has the power to adjudicate against all defendants, as we noted in our bench memorandum of Dec. 11, 1981, at pages 35–36. We there articulated the appropriate precepts and exercised our discretion to consider and determine these claims, along with the other non-frivolous federal claims asserted by plaintiffs. *See Kerry Coal Co. v. United Mine Workers*, 637 F.2d 957, 965 (3d Cir. 1981). Finally, we note that 29 U.S.C. § 187(a), on which Counts 1 and 2 are based, requires a showing of a relationship with interstate commerce as part of an unfair labor practice claim for damages based on Section 8(b)(4). The court finds that plaintiffs have proved that they were engaged in interstate commerce, or activity affecting such commerce.

(19) In our bench memorandum of Dec. 11, at pages 33–36, we noted that the claims of plaintiffs, predicated on Sections 8(b)(4) and 303 of the Labor Management Relations Act, 29 U.S.C. § 187, may not proceed against the individual defendants named in the complaint. *See Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962). Defendants Miller, Antal, Sabo, Taylor, Chach, Scarton, Harris, Taranto, Mulhollen, Michel, Cleaver, Connor, DePellegrin, Eshenbaugh, Lash, Montgomery, Riggatire, Ponce, Black, Matter, Valauri, Nemeth, Doe and Roe were dismissed as parties in the claims asserted by plaintiffs in Counts 1 and 2. Thus we turn to the question of the burden of plaintiffs proof against the International, Districts 5 and 2, and Locals 1269, 4426, 6132 and 1368, as asserted in Counts 1 and 2. We will treat each count in the order presented in the complaint against each defendant as that party appears in the caption.

■ (20) The question of the burden of proof in a claim posited on Sections 8(b)(4) and 303 of the Labor-Management Relations Act of 1947 has been resolved. Plaintiffs must prove their claims against these labor organizations by a preponderance of the evidence. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 736, 86 S.Ct. 1130, 1144, 16 L.Ed.2d 218 (1966). The more stringent standard of "clear proof" under Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, is not applicable.

(21) *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979), and *Kerry Coal Co. v. United Mine Workers*, 637 F.2d 957, 963 (3d Cir. 1981) teach that, with respect to the liability of the International, we must determine whether the plaintiffs have established by a preponderance of the evidence that the International "instigated, supported, ratified, or encouraged" illegal secondary conduct. The test can be further distilled by determining: (a) whether any employee of the International "instigated, supported, ratified or encouraged" the activity complained of, and (b) if so, was he acting for the International? *Kerry Coal Co., supra* at 963. To repeat, plaintiffs must establish each position by a preponderance of the evidence.

(22) Reference should also be made to Section 301(b) of the Labor Management Relations Act. 29 U.S.C. § 185(b). Section 303 of the Act refers to Section 301(b), which provides that labor organizations shall be bound by the acts of their agents. Moreover, "the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 185(e). Thus under the common law of agency, the questions of express, implied and apparent authority are relevant considerations in our separate analysis of the liability of each labor organization that is a defendant in this case. However, the mass action theory of liability articulated in *Eazor Express Inc. v. Teamsters*, 520 F.2d 951 (3d Cir. 1975) was repudiated by the Supreme Court in *Carbon Fuel.*

(23) Plaintiffs argue that the evidence establishes that certain employees of the International, acting within the scope of their employment, directed, authorized, in-

stigated, supported, encouraged or ratified illegal activity at the plaintiffs' facilities. Plaintiffs are, as we have noted, secondary employers. Plaintiffs rely primarily upon the following evidence in support thereof:

(A) The testimony of Estel Taylor that International employee Jay Kolenc supplied him with maps and information regarding the names and locations of non-union mines at the Meadowlands Hilton and the Beaver Falls Holiday Inn;

(B) The testimony of Estel Taylor that International employee Jay Kolenc was on the picket line with him, on one occasion, at the New Castle Power Plant, a customer of plaintiffs;

(C) The evidence that Kolenc was on the picket line at Kerry Coal Co., another secondary employer;

(D) The evidence that Miller Savage, William Corfont, Steve Paronish, Marion Ladisic, Nick Cecil, James Mullen, and others, submitted vouchers during the strike to the International bearing such notations as "on picket duty" or "checking on non-union strips or mines;"

(E) The voucher of George O'Bush, an International employee, marked Exhibit 25D, indicating that on December 11, 1977, he was "showing men how to get to non-union mines;"

(F) The evidence that Miller Savage, an employee of the International, engaged in picketing at Duquesne Light Co. and made a coercive threat to an employee of that company, and Veon Coal Co., and also that he participated in unspecified picketing from December 6 to 12, 1977;

(G) The evidence that Paul Bitcko attended a meeting at the Sheraton Inn in Clarion, Pennsylvania on December 14, 1977, with Scarton, Harris, Hailman, Barkley and others;

(H) The statement of one Wolliver that he had been given maps by International employees of non-union mines;

(I) The testimony of Troopers Haskins and DeWire that International employee, Nick Cecil, was in the parking lot of Forresters Bar following the incident at the Rim-

ersburg Tipple on February 1, 1978. Cecil demanded to know why Cleaver and Lash, members of the U.M.W., had been arrested. Cecil also presented a card displaying his position with the International;

(J) The entry of a preliminary injunction by the Court of Common Pleas of Cambria County, Pennsylvania, against the International and others, on Dec. 22, and a permanent injunction on Dec. 28, 1977. Suit was instituted by plaintiff, Cambria Coal Company;

(K) The entry of a preliminary injunction by the Court of Common Pleas of Clarion County, Pennsylvania, against the International and others on Dec. 13, and a permanent injunction on Dec. 19, 1977. Suit was instituted by plaintiff, C & K Coal Company; and

(L) The article which appeared in the Journal of the U. M. W. in November of 1977 urging the establishment of picket committees with the statement "We know how to arrange a program that is both fair and effective."

(24) Our itemization represents a selection of the facts deemed most significant by the court, as presented by plaintiffs on this issue. It is not all inclusive. Suffice to say we have considered all the facts of record presented by the parties. The facts we mention here are only those which form the basis of our judgment. After 13 weeks of trial, 99 witnesses, and hundreds of exhibits, we can do no more. It would be impossible to discuss every fact or exhibit of record.

■ (25) We find that the plaintiffs have failed to establish by a preponderance of the evidence, that the International directed, authorized, instigated, supported, encouraged or ratified illegal secondary activity. We find that the fair weight of the credible evidence preponderates on behalf of the International.

(26) We find the evidence that Jay Kolenc supplied Estel Taylor with maps and the location of non-union mines in Western Pennsylvania fails to establish, by a prepon-

derance of the evidence, that the International directed, authorized, instigated, supported, ratified or encouraged illegal secondary activity toward plaintiffs. International organizers use such information in their organizational efforts and it is reasonable to infer, and we so find, that Taylor intended to employ the information to assist Kolenc in lawful organizing efforts at non-union mines. Further, the fair weight of the credible evidence establishes that Kolenc never directed, authorized or ratified illegal activity with regard to plaintiffs, either during the meeting at the Meadowlands Hilton or at the Beaver Falls Holiday Inn. We find the evidence of plaintiffs in this regard to be neutral at best and non-probative in particular; and since, plaintiffs bear the burden of proof, they have failed to sustain their burden by a preponderance of the evidence. Finally, we find that after giving the information to Taylor, Kolenc was not required to take affirmative actions. if District 5 subsequently used the information for illegal secondary activities directed at plaintiffs. *Carbon Fuel Co., supra*, teaches that there is no obligation, implied by law, on the part of an international union to use all reasonable means to prevent illegal activity by its members, so long as it does not instigate, support, ratify or encourage illegal activity. We find that plaintiffs have failed to meet the test of *Carbon Fuel*, by a preponderance of the evidence.

■ (27) The right to picket peacefully is a lawful activity, unless it threatens, coerces or restrains a secondary or neutral party within the meaning of § 8(b)(4). *See, NLRB v. Retail Store Employees*, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980); *NLRB v. Fruit Packers*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). Informational picketing of secondary employers is a lawful activity, under some circumstances. *NLRB v. Fruit & Vegetable Packers, supra*. Thus vague testimony that Jay Kolenc, who was an International employee at the time, was on a picket line at one of plaintiffs' customers, on one isolated occasion, *without more*, does not establish liability on the part of the International. We find that the evi-

dence of the activity of Jay Kolenc at New Castle Power Co., on one occasion, to be insufficient to carry plaintiffs' burden of proof. Plaintiffs failed to prove that, on the unspecified date of Kolenc's presence at plaintiffs' customer he did or did not carry a sign; or the extent of his participation; or that he was engaged in mass picketing; or that he engaged in any violence; or the location of the picketing; or that he blocked ingress or egress to the plant; or the object or reason for such picketing; or that he threatened, coerced or restrained any employee or employer; or that he engaged in any act proscribed by Section 8(b)(4) or federal law. *See Buckeye Power, Inc. v. Utility Workers*, 607 F.2d 759 (6th Cir. 1979). We emphasize that plaintiffs have failed to prove, by a preponderance of the evidence, that Kolenc's activities were coercive in any manner, including the means employed, or the purposes intended. We also find there is no evidence that on the days certain truckers, such as William Hanna and James Guth, were prevented from making deliveries to New Castle Power, from C & K, was the day on which Kolenc was present. Thus we find that plaintiffs have failed to prove, by a preponderance of the evidence, that Kolenc participated in any illegal secondary activity. Finally, the fact that he was paid a salary at the time by the International is not significant because as, we have found, he was not engaged in illegal activity. Moreover, we also find that, with respect to Jay Kolenc, plaintiffs have failed to prove that he was acting for the International and within the scope of his employment, by a preponderance of the evidence, on the date of his only appearance at New Castle Power Co.

(28) Plaintiffs' evidence that Kolenc met with Gary Ashton concerning the picketing of Kerry Coal Company, and was observed on the picket line of Kerry's Franklin site, is insufficient to establish the liability of the International in this case. Kerry Coal Company is not a party in this case and therefore his activity with respect to Kerry, does not establish that the International instigated, supported, ratified or encour-

aged the events about which plaintiffs complain, by a preponderance of the evidence. Although Federal Rule of Evidence No. 406 authorizes the admission of such evidence to establish a pattern or practice, and this court received that evidence for such a purpose, we now find that plaintiffs have failed to establish, by a preponderance of the evidence, a pattern or practice by the International, which establishes the liability of that party to plaintiffs.

(29) The evidence that Miller Savage, William Corfont, Steve Parovich, Marion LaDizek, and others, submitted vouchers to the International, during the strike, bearing such notations as "checking on non-union strips or mines," and "on picket duty," we find does not establish that the International is liable, by a preponderance of the evidence. We find that the phrase "checking on non-union strips or mines" meant just that. And we find that they were checking on the strips for the purpose of locating and organizing those companies at a later date. The evidence preponderates that the most advantageous period for an organizer to locate nonunion companies is during a strike at the union mines, since only the non-union companies are operating. Further, we find that the statement in the vouchers "on picket duty" fails to establish that the International instituted, supported, ratified or encouraged illegal secondary activity. The fair weight of the credible evidence is to the contrary. We find that the words "on picket duty" referred to picketing of primary employers, and it is insufficient to support the inference that it involved the plaintiffs, or other non-union companies. Our finding is based on the impressive evidence of the International, and the denial of the International employees that they picketed plaintiffs' facilities. We find these witnesses to be credible and the weight of the evidence preponderates on behalf of the International in this regard.

(30) The voucher of George O'Bush, an International employee, reflects that he was "showing men how to get to non-union mines" and we find that it is insufficient evidence to meet the first prong of the test

explicated in *Kerry Coal Co. v. United Mine Workers*, 637 F.2d at 963. The phrase is subject to varying interpretations and inferences, and we note that the statement makes no reference to picketing, illegal conduct or the plaintiffs. We find the testimony of Mr. O'Bush to be persuasive and credible that he never instructed any member of District 2 to conduct any picketing at plaintiffs' facilities. Further, we find that plaintiffs have failed to establish by a preponderance of the evidence that Mr. O'Bush was acting within the scope of his employment or that the International ratified any act.

(31) The evidence is even less persuasive with regard to the activities of Miller Savage. Savage readily admitted picketing at Duquesne Light Co. in Washington County. But Duquesne Light was a primary not a secondary employer. Therefore his activities were lawful. While it appears that Mr. Savage may have threatened an employee of Duquesne Light Co., this conduct is of no benefit to plaintiffs. It is not probative of plaintiffs' theory of liability against the International because there is no credible evidence that Mr. Savage engaged in illegal secondary activity involving the plaintiffs. The same reasoning obtains with respect to his activities at Veon Coal Company. Veon is not a party to this action and whatever Mr. Savage may have said to Jack S. Courtney on December 12, 1977, at Veon's Hostetler Pit, does not establish that the International instigated, supported, ratified or encouraged illegal secondary conduct, by a preponderance of the evidence, vis-a-vis the plaintiffs. There is no credible evidence that the International orchestrated the illegal conduct of which plaintiffs complain. The clear weight of the credible evidence supports the position of the International.

(32) The meeting at the Sheraton Inn in Clarion on December 14, 1977, involving Paul Bichko, does not satisfy plaintiffs' burden of proof. The evidence establishes that, while present, he said nothing. He was asked by Mr. Scarton to attend as a courtesy to Mr. Bichko's position with the

International. There is no evidence that he made any comments, or performed any act violative of § 8(b)(4) of the Act. *Carbon Fuel Co., supra,* teaches that there is no affirmative duty on the International to act, so long as it does not instigate, support, ratify or encourage illegal conduct. We find that the presence of Mr. Bichko at the meeting, without more, does not satisfy plaintiffs' burden of proof by a preponderance of the evidence. We find that Mr. Bichko was a credible witness and his explanation of the event is persuasive. The International presented evidence which establishes that it did not violate the National Labor Relations Act by its conduct. The mere presence of an International employee at a meeting when a coercive threat is made by a member of another labor organization does not premise liability upon the International by a preponderance of the evidence.

■ (33) The statement of Mr. Wolliver is to the same effect. To supply maps and information concerning the location of non-union mines does not establish, on this record, that the International directed, authorized, etc., the use to which the information was put. The fair weight of the credible evidence preponderates to the contrary.

(34) Evidence that Nick Cecil was present in the parking lot of Forresters Bar on February 1, 1978, is equally unpersuasive in our view. There is no evidence that he was engaged in the activities at Rimersburg Tipple, and we cannot conclude that his interest in the well-being of two miners is somehow violative of federal labor law. We find that the acts of Mr. Cecil failed to establish by a preponderance of the evidence that the International, acting through Nick Cecil, instigated, supported, or ratified, illegal secondary activity.

(35) The entry of injunctions against the International by the Courts of Common Pleas of Clarion and Cambria Counties, Pennsylvania, is of no significance. A careful reading of the decrees indicates that the International, and others, were ordered to avoid certain conduct with respect to plaintiffs. But as we have found there is insufficient evidence, on this record, that the International engaged in such conduct either prior to, or following the entry of these orders. Consistent with our findings is the fact that plaintiffs never cited the International for contempt following the orders of Dec. 13 or December 22, 1977.

(36) Our finding of want of liability by the International is required by the clear weight of the credible evidence. Plaintiffs have presented, at best, isolated instances and strained inferences which pale when considered with the direct, credible evidence to the contrary. Examples of the evidence presented by the International, which we find persuasive, are as follows: The International did not:

(A) Authorize or direct picketing of plaintiffs' facilities prior to or during the strike; or

(B) Authorize or direct violence or mass picketing at plaintiffs' facilities; or

(C) Participate in any act of violence, mass picketing; coercion or threats of secondary employers or employees; or

(D) Encourage, instigate, support, promote or ratify illegal acts by its employees, members or subordinate labor organizations; or

(E) Encourage or induce secondary employers, or employees, to cease work, strike or refuse to handle plaintiffs' product; and

(F) The International did not: Pay or provide counsel for picketers, or pay fines, bonds or court costs for miners charged with violation of state criminal laws; or pay money for illegal purposes; or pay money to strikers for any illegal purpose;

(G) The Constitution of the UMW establishes various autonomous labor organizations, and there is no evidence that the International transgressed any provision of its constitution, or that it was empowered by that document to discipline any labor organization, or member thereof, under the circumstances. There was no official sanction of the unauthorized acts of the membership and the provisions relied upon by plaintiffs simply do not accord the International the power and duty to act; and

(H) The article that appeared in plaintiffs' Ex. 54, the November issue of the UMW Journal, is not probative. It makes no reference to picketing of neutral employers and we find that the reference to picketing indicates primary employers.

(37) Plaintiffs' contend that the International paid the salary of various organizers and other employees, such as Miller Savage, William Corfont, Steve Paronish, Marion LaDizek, Nick Cecil, and others, despite knowledge that they were engaged in illegal secondary activity, and thereby ratified that activity. But the evidence preponderates to the contrary. The vouchers submitted by these employees indicate, at most, that they were engaged "on picket duty" or "checking on non-union strips or mines" in Districts 2 and 5 during the strike. Picket duty is lawful for informational purposes, under some circumstances, and it was clearly lawful for these employees to picket the primary employers during this strike. Thus the term "picket duty" meant from the perspective of the International, when the work sheets were reviewed in Washington, that these men were engaged in lawful primary picketing. Thus we perceive no notice of illegal activity to the International in the use of these terms and we find no ratification of illegal activity for none existed. We find the fair weight of the credible evidence establishes that the employees of the International were not involved in illegal secondary activity.

(38) The only information reaching the International through the vouchers of its employees was that they were engaged in lawful activity during the strike. Indeed, as the evidence establishes, International organizers use a strike as a time to scout or locate non-union, unorganized companies for future organizational efforts, since these are the only companies operating during a strike. Thus we find that plaintiffs have failed to establish by a preponderance of the evidence that the International instigated, supported, ratified or encouraged any illegal secondary activity. We find the clear weight of the credible evidence establishes that James Varney, Director of Organizing for the International, and his deputy, Dennis Estep, and Edgar Gilbert instructed all International organizers and employees not to become involved in strike related activity, and we find the preponderance of the evidence establishes that no employee of the International was involved in any illegal activity in the relevant geographic area. Further, we find that plaintiffs have failed to establish by a preponderance of the evidence that any employee of the International was authorized or directed by the International to engage in any picketing of plaintiffs' facilities during the strike period, and thus had no authority to do so. Any such activity would therefore be without the scope of his employment. As a result, judgment will be entered for the International and against the plaintiffs at Counts 1 and 2.

(39) We now turn to the question of the liability of District 5 as asserted in Count 1. We find that plaintiffs have established, by a preponderance of the evidence, that District 5 instigated, supported, ratified and encouraged illegal secondary activity in violation of Section 8(b)(4) of the N.L.R.A. and the L.M.R.A. Further, we find that employees and Board Members of District 5, acting within the scope of their employment and with the intent of furthering the interests of that labor organization, directed and authorized conduct that threatened, coerced and restrained the employees of plaintiffs, the plaintiffs, customers of plaintiffs and their employees, and various trucking companies and their employees, for the object of forcing them to cease using, handling, transporting or otherwise dealing in the one product of plaintiffs, namely, coal, and/or to cease doing business with plaintiffs. Plaintiffs have met the test of *Carbon Fuel, supra,* by a preponderance of the evidence.

(40) As Estel Taylor testified, prior to the 111-day strike between the United Mine Workers and the B.C.O.A., the Executive Board of District 5 met and approved the picketing of non-union companies in District 5, including plaintiffs. We find that the purpose of the Board's action was to

threaten, coerce and restrain the employees of plaintiff in violation of Section 8(b)(4) of the N.L.R.A. and Section 303 of the L.M.R.A. District 5, acting through its employees and various local unions, their members and employees, set in motion a chain of events designed to coerce neutral employees, force plaintiffs to close its facilities during the strike, and interdict the shipment of plaintiffs' coal. The plan was sophisticated and well-coordinated.

(41) The Executive Board first agreed that it would compensate the members of District 5 for picketing, including mass picketing of plaintiffs' facilities in order to end production and shipments. A fee was established by the Board for drivers of pickets and meal money of $3/day for the pickets. A voucher system was established by the Board whereby members of the District could claim compensation for illegal activities. See Ex. 62. When a voucher was submitted to the Board for picketing plaintiffs' facilities, and coercing their employees, payment was made from a fund entitled the Dist. 5 General Fund. Board member Taylor, and other officers, delivered checks from the fund to officers of local unions in Dist. 5, who in turn paid the picketers. For example, Mr. Taylor, himself, delivered such compensation on December 18, 1977, January 11, and January 25, 1978. There are other examples. Moreover, despite the entry of a preliminary injunction on December 13, 1977, and a permanent injunction on December 19, against Dist. 5 by the Court of Common Pleas of Clarion County, which limited the number of pickets to three, President Peter Sabo continued to approve the payment of vouchers for mass picketing designed to threaten and coerce plaintiffs employees. In 1977, Dist. 5 paid from its general fund $5520 for this expense, and $37,883 in 1978. See Exs. 56 & 57.

(42) It is a reasonable inference and we find that District 5 instigated, encouraged and supported the coercive conduct, with respect to plaintiffs, at the bi-weekly meetings at the Elks Club in New Kensington, Pennsylvania. The Club served as a hub for meetings with members of the Executive Board, local union presidents and members of the District for the purpose of coordinating and implementing the coercive conduct directed at plaintiffs, a large non-union producer in Western Pennsylvania. John Chach testified that he attended these meetings and also collected vouchers from representatives of Locals 4426, 4963, 1488, 6132, 3506, 1993 and 6986, and then delivered them for payment to Peter Sabo, Secretary-Treasurer of District. Mr. Chach was aware of the illegal events of December 12, 1977, and nevertheless continued to dispense funds to the picketers for continuous coercive activities. Despite these facts, as well as the discussion of the injunctive decree against the District at the special meeting of the Board on December 21, 1977, the Board continued to support and encourage the illegal activities directed at plaintiffs. We find that the Board never made any effort to deter the illegal conduct of their membership, which it had instigated from the outset. The members of the Board acted at all times for that labor organization and within the scope of their employment.

(43) We also find that the President of District 5, acting within the scope of his employment, and with the approval of the Executive Board, established a Legal Defense Fund for the payment of fines, counsel fees and court costs for its members on December 14, 1977, as encouragement for illegal activity. Michael Encapera was appointed by Mr. Antal to administer the fund. We find that the fund was created by the Executive Board to instigate, support and encourage its members to coerce and threaten plaintiffs' employees for the purpose of closing plaintiffs' facilities. Moreover, we find that plaintiffs have established by a preponderance of the evidence that Dist. 5 ratified illegal secondary conduct by its members, with respect to plaintiffs, when it paid the fines, attorney fees and court costs with knowledge of the illegal activity concerning plaintiffs. See Kayser-Roth Corp. v. Textile Workers, 479 F.2d 524, 527 (6th Cir. 1973), cert. denied, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219.

(44) The type of picketing directed, instigated, and encouraged by the Executive Board of District 5, against plaintiffs' facilities and employees is distinguishable from the secondary picketing sanctioned by the Supreme Court in *NLRB v. Fruit & Vegetable Packers*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). Here the conduct was coercive and threatening, and designed to totally shut down plaintiffs' operations. It included mass picketing and violence, which we also find was encouraged and supported by the Executive Board. Thus it is immaterial whether we apply either the holding of *Tree Fruits* or *Retail Store Employees* because this is precisely the type of conduct that Congress intended to proscribe when it enacted Sec. 8(b)(4). The argument that Sec. 8(b)(7) is somehow applicable to these facts is without merit.

(45) We wish to emphasize that our finding of liability by the District is not based *solely* upon the finding that the District intentionally and knowingly instigated, supported and encouraged illegal secondary conduct. We also find that the payment of money to the membership from the General Fund was done with knowledge that the pickets had engaged in illegal conduct. And the payment of fines, court costs and counsel fees by the Board was done with full knowledge that its members had engaged in illegal conduct with respect to plaintiffs. Thus we find that District 5 ratified illegal conduct with full knowledge of the illegality. *See, Kayser-Roth v. Textile Workers*, 479 F.2d at 527.

(46) The Restatement of Agency (Second) at Section 82, page 210, provides that "ratification is the affirmance by a person of a prior act which did not bind him but which was done . . . on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Able counsel for District 5 has culled from the record certain vouchers which he contends establish that the Board neither knew, nor should have known, that the Board was ratifying illegal conduct when it approved the vouchers. *See* Dist. 5 Exs. 5B–5H. But counsel has presented a sanitized version of the facts. We find that

plaintiffs have established, by a preponderance of the evidence, that the Board knew of the illegal activities of its members at Rimersburg, Sligo, and plaintiffs' Clarion office on December 12, 1977, and diverse locations thereafter; knew of the illegal activities of its employees and members at the Bullion Mine on Jan. 24, 1978; knew of the acts directed at plaintiffs' spur tract at Lawsonham on January 31, 1978; knew of the acts by its employees and members at Rimersburg on February 1; knew of the acts at Stahlman Tipple on Feb. 22; knew of the acts of its members at the Van Ormer crossroads and other locations of plaintiffs throughout the strike, and thereafter knowingly paid its employees for food, fuel, coercive picketing, and also fines, court costs and counsel fees. The acts were done throughout the strike by employees of District 5, and its members, and the Board acting within the scope of its employment, intentionally ratified this conduct. We find no merit to the contention that plaintiffs somehow waived their rights under federal law when they agreed to a state court injunction limiting picketing to 3 members of the District, in light of the facts of record.

(47) Judgment will be entered on behalf of plaintiffs, C & K, Shannon, Stahlman and Vantage Coal Co., and against District 5 at Count 1. District 5 is not a defendant at Count 2.

(48) We now turn to the question of the liability of District 2 at Counts 1 and 2. We find that plaintiffs have established, by a preponderance of the evidence, that District 2 instigated, supported, ratified and encouraged illegal secondary activity in violation of Section 8(b)(4) of the National Labor Relations Act. Further we find that employees and Board members of District 2, acting within the scope of their employment and with intent of furthering the interests of District 2, directed, authorized and engaged in conduct that threatened, coerced and restrained plaintiffs, their employees, customers of plaintiffs and their employees, and various trucking companies and their employees, for the object

of forcing them to cease using, handling, transporting or otherwise dealing in the one product of plaintiffs, namely, coal, and/or to cease doing business with plaintiffs. Plaintiffs have met the test of *Carbon Fuel, supra*, by a preponderance of the evidence.

(49) We base our finding of liability against District 2 on the following facts, and inferences therefrom, which we find persuasive:

(A) The coercive statements, threats and conduct of District President, Valerio Scarton, directed at Jack Heilman, President of C & K on December 14, 1977, at the Sheraton Inn, Clarion, Pennsylvania. The coercive statements followed the invasion of C & K's headquarters by members of Districts 2 and 5 on December 12, 1977. Scarton stated that plaintiffs could backfill and maintain their equipment during the strike, but they could not ship coal. If they did, the picketing would continue in order to stop all deliveries to customers;

(B) The trespass to plaintiff's facilities of December 12, 1977, by a large group of miners with the direction and participation of Executive Board member Steve Bender. Bender was a trespasser at plaintiffs' office building and served as one of five leaders, selected by the miners, to deliver ultimatums to William Barkley. Plaintiffs were threatened with a total shut-down of operations, and Bender was present and made no effort to discourage the threats or conduct;

(C) The establishment by the Executive Board of a plan on December 8, 1977, whereby members would be compensated by the District to picket non-union mines and plaintiffs in particular. The vouchers for fuel and food were paid from the General Fund of the District in Ebensburg. The plan was established on December 8, 1977, by the Board to instigate and direct the coercion of plaintiffs' employees by the members of District 2. In short, the plan was approved to insure that sufficient manpower was available to close plaintiffs facilities; it was not for the purpose of picketing primary employers;

(D) The meetings on a regular basis at the Ebensburg Courthouse chaired by President Scarton and attended by the presidents of the Locals in District 2. (*See* Ex. 5F). From the outset, Scarton directed and authorized the coercive picketing and conduct at plaintiffs' facilities because they were the largest non-union producer in the District and the U.M.W. had lost a hotly contested certification election approximately one year before. The purpose of these meetings was to direct the closing of non-union mines during the strike.

(E) The evidence of record that members of the Board actually participated in coercive picketing of plaintiffs' facilities throughout the strike. For example, Donald Rocco was engaged in such conduct on December 12, 19, and 20, 1977, and January 3, 1978. He stated that the object was to close the non-union mines. Steve Bender was also engaged in coercive conduct at C & K headquarters and at the Van Ormer crossroads. He was present in the caravan of cars to Rimersburg Tipple on December 12, and admitted that he knew his conduct was illegal. He picketed at Van Ormer with members of Local 1619 on February 21, 1978. Board member Joseph Taranto assisted the pickets on December 9, 1977, checked on the non-union mines, and reported to the Board at the meetings in Ebensburg. Board member Rorvolo Mastrini participated in a roving caravan with members of Locals 860 and 1386 and checked on the operation of non-union mines on January 11, 1978. Mastrini is quoted in the minutes of the meeting of Local 860 as follows: "Ray Mastrini said that C & K was the only real problem— since pickets doing real well." (See Ex. 212). And when Mastrini led pickets to Clearfield County he was aware that a state court had enjoined District 2 from such activity. The evidence that Board member Lundberg and Vice President Kulish visited the pickets at the Van Ormer crossroads and that Lundberg showed the members four locations at which to picket. He also led a group to Fallen Timber on December 18. (See Ex. 211). And finally, the conduct of Mr. Scarton at the Sheraton Inn on December 14, along with the Treasurer of

District 2, Walter E. Harris. Each Board member was paid a salary during the strike, and all expenses were paid from the general funds of District 2 despite the events discussed.

(F) The establishment of a plan by the Board whereby the fines and court costs of convicted miners would be paid, and the plan to secure counsel for all miners charged with crimes, at no costs to them. These inducements were conveyed to the picketers in District 2 from the Executive Board to the Local presidents, and then to the membership.

■ (50) Our finding of liability by District 2 is not based solely upon our finding that it directed and authorized illegal secondary conduct. We also find that plaintiffs have established by a preponderance of the evidence that the Board, acting within the scope of its employment and with intent to further the interests of that labor organization, knowingly ratified the illegal conduct of its employees and members directed at plaintiffs. The Board approved the payment of fines and court costs from the Strike Relief Fund, on behalf of the following members:

| | | |
|---|---|---|
| Danny A. Smith | Keith Kephart | William Thompson |
| John Rietscha | Kenneth Wargo | Richard Boring |
| Douglas Horne | Edward S. Zatorsky | Paul Bhutvan |
| David Hallow | Lindsay Cleaver | John Croyle |
| Larry Midock | Jeffrey Lash | John Kotelnicki |
| Clarence E. Keith | Richard Mulhollen | Angelo Marra |
| Allen Lutz | James J. Tarranto | Stefan Molinick |
| Zeb Waite | Harry Korinchak | James McAnulty |
| Jerry Albright | George Williams | Richard Riddell |
| | | Norman R. Conner |

Some fines were paid as early as February 22, 1978.

(51) It also secured and paid various attorneys to represent members of the District when the Board knew that they had engaged in violations of law, including violence, directed at plaintiffs. Messr. Lash, Cleaver and Connor are examples. (See Ex. 166). And on several occasions the Board authorized payment of restitution following illegal conduct, albeit not to plaintiffs. Payments from the Fund were made by Board member Mastrini, and the President of Local 1269, Joseph Taranto.

(52) We find it interesting to note that the Board members have testified that they authorized only peaceful and informational picketing. Yet, despite a member_hip of over 10,000, the Board caused to be printed a total of 120 signs. We reject the contention that the Board authorized only peaceful picketing, or that Section 8(b)(7) of the N.L.R.A. is applicable to these facts.

■ (53) We now turn to the liability of Locals 1269, 4426 and 6132 as alleged in Count 1. We find that plaintiffs have established, by a preponderance of the evidence, that each of these labor organizations directed, authorized and ratified illegal secondary conduct in violation of the National Labor Relations Act and Section 303 of the Taft-Hartley Act.

(54) The officers of Local 1269 were involved in the coercive conduct directed at plaintiffs, particularly President, James Tarranto and Vice-President, Richard Mulhollen. The coercive conduct directed at plaintiffs' employees at Fallen Timber and the Van Ormer crossroads at Routes 53 and 253, continued throughout the strike. At Fallen Timber, the officers engaged in and directed mass picketing at the entranceways to prevent access to the property. The photographs and film of record portray the extent of this activity. The Van Ormer crossroads, approximately 200 yards from the Fallen Timber Tipple, was picketed around the clock, at the direction of the officers acting within the scope of their employment. Generally, large groups of pickets would congregate at Van Ormer and throw stones, distribute nails, threaten and cajole plaintiffs' employees and trucks. It became impossible to pass to or from plaintiffs facility through this important roadway. The Local seems to contend that, because this conduct took place without plaintiffs property, it was lawful. We reject this contention. Plaintiffs' established, by a preponderance of the evidence, that Officers Tarranto and Mulhollen selected an artery to a vital organ. Closing the artery; closed a vital organ, namely, the Fallen Timber Tipple. Moreover, Local 1269 admitted in answer to plaintiffs' interrogatories that the officers authorized the picket-

**498**

ing of plaintiffs' facilities as early as December 9, 1977. The purpose of the authorization was to close plaintiffs' operations.

(55) The authorized illegal activities of Local 1269, we find by a preponderance of the evidence, continued throughout the strike and at various facilities of plaintiffs in District 2. We also find that President Tarranto and Vice President Mulhollen ratified illegal secondary conduct of employees and members of the Local when, with knowledge, they collected vouchers for illegal conduct, urged the payment thereof, and supported the payment by the District of the fines, court costs and counsel fees stemming from the illegal activities of its members. Judgment will be entered for plaintiffs and against Local 1269 at Counts 1 and 2.

(56) The officers of Local 4426 were involved in the coercive conduct directed at plaintiffs, particularly officer Paul D. Michel. We also find the plaintiffs have established by a preponderance of the evidence that the officers, acting within the scope of employment, directed, authorized and ratified the illegal conduct of its members. The officers of 4426 established a picket committee to coordinate coercive conduct directed at non-union companies. The pickets were to be paid for fuel and food and Michel himself picketed plaintiffs operations on 20 occasions. Michel was active at C & K headquarters on Dec. 12 with members of the Local, and at the violence at Bullion on Jan. 24, 1978. The minutes of the Local (Ex. 201, p. 25) indicate that the officers demanded more pickets at plaintiffs' operations and threatened to fine members who did not participate. (*See* Ex. 201).

(57) We also find the plaintiffs established, by a preponderance of the evidence, that the officers of Local 4426, acting within the scope of their employment, ratified the conduct of its members directed at plaintiffs. After each act, vouchers were collected by the officers and knowingly submitted to District 5 for payment. The officers were also active in securing counsel, paying fines and court costs for their members knowing that they had been engaged in illegal conduct directed at plaintiffs. Judgment will be entered on behalf of plaintiffs, C & K, Shannon, Stahlman and Vantage and against Local 4426 at Count 1. Local 4426 is not a defendant at Count 2.

(58) The officers of Local 6132 were involved in coercive conduct directed at plaintiffs, particularly President Black and Recording Secretary Grishok. We also find that plaintiffs have established by a preponderance of evidence that the officers, acting within the scope of their employment, directed, authorized and ratified the illegal conduct of its members. The officers of Local 6132 passed the word that fines of $50 would be imposed upon members who did not picket non-union mines. As a result, members traveled to C & K's Rimersburg Tipple and joined a group of 500–600 members of the U.M.W. Amerigo De Pellegrin was arrested by the state police and President Jack Black secured counsel for him. After entering a plea of guilty, President Black paid one-half of the fine of $1750. The balance was paid by District 5 through use of the Legal Defense Fund, which we have found was established and controlled by the District to promote illegal secondary activity.

(59) Audley Montgomery was a member of Local 6132 and he picketed with other members at Lawsonham and at C & K at night. He was involved in illegal conduct at Rimersburg when the tipple was set on fire. He also testified that John Chach supplied maps to C & K's locations for the purpose of closing non-union companies. Montgomery was charged with violation of the Crimes Code of Pennsylvania and entered a plea of guilty. District 5 again paid the fine.

(60) Charles Ponce, a member of this local, was involved in the events at the C & K office building on Dec. 12 and at Rimersburg on Feb. 1, 1978. He received picketing vouchers from officers of the Local, who stated that members would be fined $10, if they did not picket. We find that plaintiffs have met the test of *Carbon Fuel* with regard to Local 6132 by a preponderance of

the evidence and judgment will be entered against this party on behalf of C & K, Shannon, Stahlman and Vantage at Count 1. Local 6132 is not a defendant at Count 2.

(61) We next turn to the liability of Local 1368 at Count 2. We find that Cambria Coal Co. has established that the officers of this labor organization, acting within the scope of their employment, directed, authorized and ratified illegal conduct directed at Cambria Coal by a preponderance of the evidence. The officers distributed and collected picketing vouchers. The members picketed Cambria in mass throughout the strike, primarily at the Van Ormer crossroads. Their activities were not protected by Section 8(b)(7), and they continued mass picketing at the direction of the officers despite the entry of a state court injunction to the contrary. Eugene Jenkins, for example, picketed there regularly with 50–100 miners and was routinely paid for the effort by President De Frank. The officers also obtained meals and a rented room for the pickets in cold weather. That this direction and authorization by the Local officers led to illegal secondary conduct by the members is supported in the record, by a preponderance of the evidence. The mass picketing, rock throwing and coercive conduct at the crossroads is clearly established by direct and credible evidence.

(62) We also find that plaintiffs have established, by a preponderance of the evidence, that the officers of Local 1368, acting within the scope of their employment, ratified the conduct of its members directed at plaintiffs. After each illegal act, vouchers were collected by the officers and knowingly submitted to the District for payment. The officers were also active in securing counsel for offenders, and paying fines and court costs for their members knowing that they had been engaged in illegal conduct directed at plaintiffs. Judgment will be entered on behalf of Cambria Coal and against Local 1368 at Count 2.

(63) We now turn to plaintiffs' claim for damages under the federal antitrust laws at Count 3. Plaintiffs allege at paragraphs 65 through 71 of the complaint a violation of Section 1 of the Sherman Act. 15 U.S.C. § 1. Specifically, plaintiffs aver that they were coerced into entering into an illegal agreement with defendants whereby plaintiffs would halt the production, sale and shipment of coal during the UMW strike. They contend that this agreement—between plaintiffs, as unwilling participants, and defendants—resulted in a direct and unreasonable restraint of trade and led to substantial business losses for which plaintiffs may now recover treble damages under federal law. Plaintiffs' position is clear. In their brief in opposition to defendants' motions for summary judgment, plaintiffs state:

> The crux of the Section I claim is that plaintiffs were coerced by defendants into an agreement to halt the sale and shipment of coal for a period of time during the strike. Plaintiffs contend this resulted in a direct and unreasonable restraint on trade.

Plaintiffs' Brief in Opposition to Motions for Summary Judgment, at page 11.

Again, at page 15 of the same brief plaintiffs state:

> In this case, plaintiffs specifically claim in their complaint and pretrial statement that they were coerced into an agreement not to ship or sell coal. As noted in plaintiffs' pretrial statement, this agreement was the extorted, price for freedom from defendant's campaign of violence, intimidation and destruction against nonunion mines.

Finally, in their pretrial statement, plaintiffs explained the Sherman Act claim as follows:

> . . . C & K was coerced into agreeing with defendants to halt the sale and shipment of coal in interstate and intrastate commerce. The force and effect of defendants' illegal conduct was to impose a direct and unreasonable restraint upon trade and commerce, specifically the coal market, in violation of the antitrust laws.

(64) We begin by noting that this peculiar type of alleged conspiracy, that is, between labor organizations and an

unwilling employer—may indeed form the basis of an anti-trust action. *See Connell Construction Co. v. Plumbers Local 100,* 421 U.S. 616, 635, 95 S.Ct. 1830, 1841, 44 L.Ed.2d 418 (1975). Moreover, as this court noted in disposing of defendants' motions for summary judgment, the statutory exemptions embodied in the Clayton and Norris-La-Guardia Acts apply only to *unilateral* activities of labor organizations. Those exemptions are inapplicable where, as here, the alleged agreement to restrain trade was entered into between a labor organization and a non-labor group such as plaintiffs. I Areeda & Turner, Antitrust Law, Sec. 229 at p. 191; *see also, U. S. v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). After carefully reviewing all of the evidence produced at trial, we find that plaintiffs are not entitled to relief under the Sherman Act. We base our conclusion on three separate grounds.

(65) We find that plaintiffs have failed to prove by a preponderance of the evidence that an agreement to restrain trade was entered into between plaintiffs, as unwilling participants, and defendants. Section I of the Sherman Act provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." Essentially, two factors must be present in order to demonstrate a violation of this section of the Act. First, there must be a plurality of actors; that is, two or more persons. Second, there must be concerted action. *See* 2 Von Kalinowski, Antitrust Laws and Trade Regulation, Sec. 6.01[1] (1981). *See also, Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 445 (3d Cir. 1977), *cert. denied* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

(66) To establish the existence of concerted action, plaintiffs must submit evidence from which this court could reasonably infer that the defendants and C & K, as unwilling participants, had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (1980); *Klein v. American Luggage Works, Inc.,* 323 F.2d 787, 791 (3d Cir. 1963). We recognize that direct proof of an express agreement is not required. On the contrary, plaintiffs may rely on an inference of a common understanding drawn from circumstantial evidence. *Edward J. Sweeney & Sons, supra; William Goldman Theatres v. Loew's, Inc.,* 150 F.2d 738, 743 n.15 (3d Cir. 1945).

 (67) Nonetheless, viewing all of the evidence produced at trial, we conclude that the plaintiffs have failed to prove by a preponderance of the evidence that, as unwilling co-conspirators, they entered into an agreement with defendants to achieve an unlawful objective in restraint of trade.

(68) In this case, there was no written agreement to restrain trade, as was alleged in *Connell.* 421 U.S. at 619–620, 95 S.Ct. at 1833–1834. Plaintiffs instead have attempted to establish that an oral or tacit agreement was consummated, between themselves and defendants, to illegally restrain trade by halting the production and distribution of coal. However, we find the evidence to be insufficient and unpersuasive for the following reasons:

(A) There is no evidence that, at the meeting of December 14, 1977, attended by Val Scarton, plaintiffs entered into any agreement to cease shipping and producing coal;

(B) To the contrary, the evidence produced at trial belies this assertion. There was no meeting of the minds and as evidence thereof, plaintiffs continued to produce and ship coal at every available opportunity.

(C) We note that the facts in this case are clearly distinguishable from *Larry V. Muko, Inc., v. Southwestern Pennsylvania Building and Construction Trades Council [Muko II],* 670 F.2d 421 (3d Cir. 1982). In *Muko,* the jury specifically found that the defendant-labor organization had conspired with the employer to restrain trade. At p. 424. Here, the evidence is to the contrary.

(D) With respect to the International, *a fortiori* plaintiffs have failed in their burden of proof. There is no evidence that the

International consummated an agreement with plaintiffs, explicit or tacit, to restrain trade. Nor is there clear proof that the International directed, authorized or ratified such an agreement between plaintiffs and other defendants.

(69) Simply stated, we have here a classic case of unilateral activity on the part of certain labor organizations, that is, Districts, Locals, and their members. This activity, as we have found, constitutes illegal secondary activity in violation of Section 8(b)(4) of the National Labor Relations Act. But to find that an agreement was consummated between plaintiffs and defendants to restrain trade in this case would be to stretch the facts beyond recognition, and would serve to transform virtually every 8(b)(4) violation into an action for treble damages under the Sherman Act. We therefore hold that plaintiffs have failed to prove, by a preponderance of the evidence, that plaintiffs entered into an agreement with any of the defendants to illegally restrain trade.

■ (70) Secondly, and perhaps most importantly, we conclude that, even if we assume some violation of the Sherman Act in this case, recovery under that Act would be pre-empted by the carefully defined remedies of Section 8(b)(4) of the National Labor Relations Act. The legislative history of Section 8(b)(4) of the Act makes clear that antitrust damages are not available in this case.

(71) For a number of years, following the passage of the Norris-LaGuardia Act in 1932, until the enactment of the Labor Management Relations Act in 1947, union economic pressure directed at a neutral or secondary employers was not subject to sanctions under federal labor law. However, the distinction between primary and secondary activity was largely abrogated in 1947, with the passage of the Taft-Hartley Act. Ch. 120, 61 Stat. 136 (codified in scattered sections of 18, 29 U.S.C.) Among other things, that Act added section 8(b)(4) to the National Labor Relations Act, thereby prohibiting certain secondary activity by labor organizations. *See Carpenters Union*

*v. NLRB*, 357 U.S. 93, 98, 78 S.Ct. 1011, 1015, 2 L.Ed.2d 1186 (1958).

(72) Section 8(b)(4) provides in part as follows:

It shall be an unfair labor practice for a labor organization or its agents—

(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title:

29 U.S.C. Sec. 158(b)(4).

(73) It is clear from the legislative history of the Act that Congress deliberately chose not to subject labor unions to the sanctions of the antitrust laws for violations of Section 8(b)(4). The original House version of the Act, known only as the Hartley Act, would have explicitly subjected unions to antitrust liability. *See* H.R. 3020, 80th Cong., 1st Sess. Sec. 301 (1947), *reprinted in* 1 NLRB, Legislative History of the Labor Management Relations Act, 1947, at 92–94 (1948). However, when the Hart-

ley Act reached the Senate, it was rejected, and various new proposals emerged.

(74) The first version of the Senate bill, S.1126, would have provided that certain secondary activities on the part of labor organizations constituted unfair labor practices, and would have allowed such activities to be enjoined on application of the National Labor Relations Board. No private remedy was authorized in the bill as initially approved by the Committee. *See* S.Rep.No. 105, 80th Cong., 1st Sess., 1 Leg. Hist. of LMRA, 413–414, 428.

(75) But this version of the Act created division within the Senate. Four members of the Senate Committee on Labor and Public Welfare—Senators Ball, Taft, Donnell and Jenner—felt that a number of the provisions of the bill could be stronger. They therefore proposed the so-called Ball Amendment, which would create a two-fold private remedy for violations of the Act: first, the right to sue for an injunction, and second, the right to sue for damages under the federal antitrust laws. *See* S.Rep.No. 105, *supra*, 1 Leg.Hist. of LMRA 456–462. The proposed Ball Amendment was explained by its four sponsors as follows:

> The amendment proposes that (the injured party) be entitled to file a suit for damages and obtain a temporary injunction while that suit is being heard . . .
>
> The amendment, furthermore, removes the protection of the Clayton Act from monopoly agreements to fix prices, allocate customers, restrict production, distribution, or competition, or impose restrictions or conditions on the purchase, sale, or use of material, machines, or equipment. While the existence of the union should not be a combination in restraint of trade, we see no reason why unions should not be subject in this field to the same restriction as are competing employers.

S.Rep.No. 105, *supra*; 1 Leg.Hist. of LMRA, at 460–461.

(76) The Ball Amendment, however, ran into considerable opposition in the Senate, by those who considered its remedies too harsh. As a compromise, Senator Taft pro-posed that private parties be given a right of action, for violations of the Act, but only a right to sue for *actual* damages. Treble damages under the antitrust laws would not be available. This was made explicit by Senator Taft's remarks as he introduced the new proposal:

> This is similar to the Ball Amendment, dealing with the jurisdictional strikes and secondary boycotts. It eliminates the in junctive process, the suspension of the Norris-LaGuardia Act, which I found was creating so much difficulty and opposition to the Ball Amendment. It retains simply a right of suit for damages against any labor organization which undertakes a secondary boycott or a jurisdictional strike.

2 Leg.Hist. of the LMRA, at 1370–1371.

(77) Senator Taft further stated that the purpose of his proposal "is only to restore to people, who lose something, because of boycotts and jurisdictional strikes, the money which they have lost." *Id.* at 1371.

(78) Significantly, during debate on the floor over the Taft proposal, Senator Morse from Ohio expressed concern that the statute would impose sweeping punishment upon unions, and subject them to enormous liability in private lawsuits. 2 Leg.Hist. of the LMRA at 1398. Senator Taft responded by making it clear that the bill was not designed to permit the use of antitrust sanctions against prohibited secondary activity:

> Under the Sherman Act the same question of boycott damage is subject to suit for damages and attorneys' fees. In this case we simply provide for the amount of actual damages.

*Id.* at 1398. On May 9, 1947, Senator Taft's proposal was adopted by the Senate. 93 Cong.Rec. 4874–4875, 2 Leg.Hist. of LMRA, 1399–1400.

(79) It clearly emerges that the legislators who framed Section 8(b)(4) of the Taft-Hartley Act intended that recovery of actual damages under 8(b)(4) would preempt recovery under the antitrust laws. And as the Supreme Court has stated: "In dealing

with problems of interpretation and application of federal statutes, we have no power to change deliberate choices of legislative policy that Congress has made within its Constitutional powers. Where Congressional intent is discernible—and here it seems crystal clear—we must give effect to that intent." *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 215, 82 S.Ct. 1328, 1339, 8 L.Ed.2d 440 (1962).

(80) Our conclusion is not inconsistent with the Supreme Court's holding in *Connell, supra.* In that case, the Court authorized recovery under Section 8(e) of the National Labor Relations Act but that section contained no specific provision for remedies, and thus enjoyed a history distinct from Section 8(b)(4).

(81) Significantly, the Supreme Court in *Connell* expressly acknowledged that recovery under Section 8(b)(4) of the Act—unlike recovery under Section 8(e)—might preempt recovery for treble damages under the antitrust laws. The Court stated:

> Finally, Local 100 contends that even if the subcontracting agreement is not sanctioned by the construction industry proviso and therefore is illegal under § 8(e), it cannot be the basis for antitrust liability because the remedies in the NLRA are exclusive. This argument is grounded in the legislative history of the 1947 Taft-Hartley amendments. Congress rejected attempts to regulate secondary activities by repealing the antitrust exemptions in the Clayton and Norris-LaGuardia Acts, and created special remedies under the labor law instead. It made secondary activities unfair labor practices under § 8(b)(4), and drafted special provisions for preliminary injunctions at the suit of the NLRB and for recovery of actual damages in the district courts. § 10(1) of the NLRA, 49 Stat. 453, as added, 61 Stat. 149, as amended, 29 U.S.C. § 160(1), and § 303 of the Labor Management Relations Act, 61 Stat. 158, as amended, 29 U.S.C. § 187. But whatever significance this legislative choice has for antitrust suits based on those secondary activities prohibited by § 8(b)(4), it has no rele-

vance to the question whether Congress meant to preclude antitrust suits based on the 'hot cargo' agreements that it outlawed in 1959.

421 U.S. 633–634, 95 S.Ct. at 1840–1841.

(82) We conclude that the legislative history of Section 8(b)(4) manifests a clear Congressional intention to remedy illegal secondary activities exclusively by way of the labor laws. Recovery of treble damages under the antitrust laws, for the same illegal activities, is preempted. *See also Allied Intern. v. Intern. Longshoremen's,* 640 F.2d 1368, 1381 (1st Cir. 1981).

(83) This conclusion draws support from the overwhelming number of scholars and commentators who have examined the question. *Cf. St. Antoine, Connell: Antitrust at the Expense of Labor Law,* 62 Virginia L.R. 603 (1976); Handler & Zifchack, *Collective Bargaining and the Antitrust Laws: The Emasculation of the Labor Exemption,* 81 Columbia L.R. 459, 514–15 (1981); Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977,* 77 Colum.L.R. 979 (1977); Note, *The Supreme Court, 1974 Term,* 89 Harv.L.R. 47 at 237 (1975); Note, 21 Vill.L.R. 342, 351–353 (1975–76); Note, 61 Cornell L.R. 436, 459 (1976).

(84) There is a third and distinct basis for our rejection of the antitrust claims of plaintiffs. If we assume for the sake of argument that plaintiffs have established by a preponderance of the evidence that the parties entered into an agreement to restrain trade in violation of the Sherman Act, and if we assume further that the remedies of the Labor Management Relations Act do not preempt the remedies of the Sherman and Clayton Acts, plaintiffs can not recover because we find that plaintiffs have failed to prove by clear proof that any of these labor organizations participated in, directed, authorized or ratified such conduct, as required by Section 6 of the Norris-LaGuardia Act and *United Mine Workers v. Gibbs,* 383 U.S. 715, 735–36, 86 S.Ct. 1130, 1143–44, 16 L.Ed.2d 218 (1965). Without clear, unequivocal and convincing evidence the antitrust claims must fail, and

based on the three reasons previously discussed, namely, absence of proof of an unlawful agreement by a preponderance of the evidence, pre-emption, and lack of clear proof of agency as required by Congress, judgment must be entered on behalf of defendants at Count 3.

 (85) We are next required to determine whether plaintiffs have established their pendent tort claims predicated on state law in Counts 5 through 10. Plaintiffs must establish their tort claims for intentional interference with a contractual relationship, conspiracy and trespass by clear proof. Clear proof has been defined by the Supreme Court as "clear, unequivocal and convincing." *United Mine Workers v. Gibbs*, 383 U.S. 715, 737, 86 S.Ct. 1130, 1145, 16 L.Ed.2d 218. Proof must be by a substantial margin for the test lies somewhere beyond proof by a preponderance of the evidence but less than proof beyond a reasonable doubt. *Ramsey v. U.M.W.*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971).

(86) Turning to the state law claims in Counts 5–10 against the International, we believe it follows that, if the plaintiffs have failed to establish that the International participated in, directed, authorized or ratified the illegal secondary conduct by a preponderance of the evidence, a similar result is required when the law mandates a more stringent burden of proof, arising from the same operative facts. We will make a separate finding concerning the International, however; and in doing so we adopt our findings of fact as set forth in findings 25–38.

 (87) We find that plaintiffs have failed to establish by clear, unequivocal and convincing evidence that the International participated in, or directed, authorized, instigated, supported, encouraged or ratified any conduct which tortiously interferred with plaintiffs' contractual relationship, or which conspired thereto or which constituted a trespass to plaintiffs' facilities.

(88) We also find that plaintiffs have failed to establish by clear, unequivocal and convincing evidence that any employee of

the International was acting for that labor organization and within the scope of his employment, when such conduct allegedly took place. Judgment will be entered on behalf of the International on the pendent claims asserted in Counts 5 through 10.

 (89) We next turn to the question of whether plaintiffs have established their state law claims against defendant, Arnold Miller, by clear proof. Mr. Miller is a defendant in Counts 5 through 10. We find that plaintiffs have failed to sustain their burden of proof. First, the record is devoid of evidence that Arnold Miller personally engaged in any illegal activity in Districts 2 or 5 during the strike of 1977–78, or that he directed or authorized such activity. Second, there is no credible evidence that Arnold Miller, as President of the International, is liable to plaintiffs based on the common law of agency. *See Carbon Fuel Co. v. United Mine Workers*, 444 U.S. at 212, 100 S.Ct. at 217. The evidence establishes and we find that Arnold Miller neither authorized, directed, participated in, nor ratified any unlawful activity by any person or organization. Plaintiffs contend that Mr. Miller approved the salary payment, and expense vouchers of certain employees of the International who were engaged in picketing or the scouting of non-union mines. As we have found, however, the credible evidence establishes that no employees of the International, or defendant-Miller as President, engaged in any illegal activity. Clearly the vouchers in evidence are not adequate to establish that any illegal activity occurred, and there is no credible evidence or clear proof that Mr. Miller instigated, supported, ratified or encouraged any illegal conduct by any person or organization. We also adopt where relevant the findings with regard to the International as they may pertain to Arnold Miller. Judgment will be entered for Mr. Miller and against plaintiffs at Counts 5, 6, 7, 8, 9, and 10.

 (90) We also find that plaintiffs have failed to establish by clear, unequivocal and convincing evidence that District 5 participated in, directed, authorized or rati-

fied the conduct complained of in Counts 5, 6 and 7. We are mindful that we have found that plaintiffs have established their claim for damages under the Taft-Hartly Act against District 5, by a preponderance of the evidence. But in the pendent claims asserted in Counts 5, 6 and 7 against the District, plaintiffs must prove their case by clear proof. Plaintiffs have failed to meet that burden.

(91) Our finding of want of clear proof against District 5 is based on the evidence of record. The officers of District 5 testified that they did not direct, authorize or ratify illegal secondary conduct directed at plaintiffs. They also testified that they did not participate in, encourage or institute such activity. While there is evidence to the contrary, as we have noted, we find that the evidence does not constitute clear, unequivocal and convincing evidence. It does not rise to evidence by a substantial margin against District 5. Judgment will therefore be entered on behalf of District 5 and against C & K, Shannon, Stahlman and Vantage at Counts 5, 6 and 7.

(92) We also find that plaintiffs have failed to meet the clear proof standard of Sec. 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, with respect to the officers of District 5, who are named as defendants in Counts 5, 6 and 7. The officers testified that they did not engage in intentional conduct designed to interfere with plaintiffs' contractual relationships, or conspire to commit an unlawful act, or trespass upon plaintiffs' property. While there is evidence to the contrary, as we have noted, we find that the evidence against Louis Antal, Pete Sabo and Estel Taylor does not constitute clear, unequivocal, and convincing evidence. Judgment will be entered on behalf of Antal, Sabo and Taylor and against C & K, Shannon, Stahlman and Vantage at Counts 5, 6 and 7.

(93) Turning to the claims against District 2 in Counts 5 through 10, we find that plaintiffs have failed to establish by clear proof that District 2 participated in, or directed, authorized or ratified conduct designed to interfere with plaintiffs' contrac-

tual relationships or conspired with regard to those relationships or trespassed at plaintiffs facilities. We are mindful that we have found that plaintiffs have established their Taft-Hartley claims against District 2 by a preponderance of the evidence, but that evidence does not constitute clear proof of the state law claims, and we so find. We also find that plaintiffs have failed to establish by clear proof that the officers of District 2 were acting within the scope of their employment and with intent to further the interests of District 2, as alleged by plaintiffs. Judgment will be entered for District 2 on the state law claims of plaintiffs.

(94) We now turn to the liability of the District 2 officials, namely, Val Scarton and Walter Harris, at Counts 5 through 10. Plaintiffs have failed to establish by clear proof that either Scarton or Harris personally interfered with plaintiffs' contractual relationships, or intentionally conspired to do so with regard to plaintiffs. There is also no clear proof that they personally and knowingly trespassed at plaintiffs' facilities. Judgment will therefore be entered on behalf of Valerio Scarton and Walter Harris at Counts 5, 6, 7, 8, 9 and 10.

(95) We find that plaintiffs have failed to establish by clear proof that Local 1269 participated in, or directed, authorized or ratified the conduct complained of in Counts 5 through 10. The record does not establish evidence by a substantial margin. We also find that plaintiffs have failed to establish by clear proof that the officers of Local 1269 were acting within the scope of their employment and with the intent of furthering the interests of the Local, as alleged by plaintiffs. Judgment will be entered on behalf of Local 1269 on the pendent claims of plaintiffs.

(96) We find that plaintiffs have failed to establish by clear proof that James J. Tarranto and Richard Mulhollen personally interfered with plaintiffs' contractual relationships, or conspired to do so. There is also no clear proof that they intentionally and knowingly trespassed at plaintiffs' fa-

cilities. Judgment will be entered on behalf of Tarranto and Mulhollen at Counts 5, 6, 7, 8, 9 and 10.

(97) We find that plaintiffs have failed to establish by clear proof that Local 4426 participated in, or directed, authorized or ratified the conduct complained of in Counts 5 through 10. The record does not reflect evidence by a substantial margin. We also find that plaintiffs have failed to establish by clear proof that the officers of Local 4426 were acting within the scope of their employment and with the intent of furthering the interests of the Local, as alleged by plaintiffs. Judgment will be entered for Local 4426 on the pendent claims of plaintiffs.

(98) We find that plaintiffs have failed to establish by clear proof that Paul D. Michel personally interfered with plaintiffs contractual relationships or intentionally conspired to do so, or intentionally trespassed at plaintiffs' headquarters on December 12, 1977, and the Buillon Mine on January 24, 1978. Judgment will be entered for Paul D. Michel at Counts 5 through 10.

(99) We find that plaintiffs have failed to establish by clear proof that Local 6132 participated in, or directed, authorized or ratified the conduct complained of in Counts 5 through 10. There is no clear, convincing and unequivocal evidence to that effect. We also find that plaintiffs have failed to establish by clear proof that the officers of Local 6132 were acting within the scope of their employment and with the intent of furthering the interests of the Local, as alleged by plaintiffs. Judgment will be entered for Local 6132 on the pendent state law tort claims.

(100) We find that plaintiffs have failed to establish by clear proof that Local 1368 participated in, or directed, authorized or ratified the conduct complained of in Counts 5 through 10. There is an absence of proof by a substantial margin in this regard. We also find that plaintiffs have failed to establish by clear proof that the officers of Local 1368 were acting within the scope of their employment and with the intent of furthering the interests of the

Local, as alleged by plaintiffs. Judgment will be entered for Local 1368 on the state tort claims of plaintiffs.

(101) After considering the state law tort claims against Lindsay R. Cleaver, Norman L. Connor, Jr., Amerigo De Pellegrin, Thomas Eshenbaugh, Jeffrey L. Lash, Audley Montgomery, Robert J. Riggatire, Charles E. Ponce, John W. Black, Robert J. Matter, Frank J. Nemeth, and Joseph G. Miller, we find that plaintiffs have failed to prove by clear, unequivocal and convincing evidence that any of these individual defendants intentionally interfered with plaintiffs' contractual relationships, or intentionally participated in a conspiracy with respect to plaintiffs. We also find that plaintiffs have failed to establish that any individual defendant intentionally trespassed upon plaintiffs' property. Judgment will therefore be entered on behalf of the individual defendants on the pendent tort claims of plaintiffs.

(102) The evidence of record presents a close question concerning whether plaintiffs have established by clear proof that several of these individual defendants intentionally trespassed at plaintiffs' property. Thus, although we intend to enter judgment on behalf of all individual defendants on this issue, we will discuss this contention when we address the issue of damages, and in doing so the court will assume for the sake of appellate review that plaintiffs have established by clear proof the tort of trespass against some of the individual defendants.

(103) We will now summarize our findings on the issue of liability:

(A) Plaintiffs have failed to establish the liability of the International on any claim;

(B) Plaintiffs have established a claim for money damages against District 5, District 2, and Locals 1269, 4426, 6132 and 1368 under Section 303 of the Labor Management Relations Act for violation of Sec. 8(b)(4) of the National Labor Relations Act;

(C) Plaintiffs have failed to establish an antitrust claim predicated on the Sherman and Clayton Acts; and

(D) Plaintiffs have failed to establish a state law tort claim against any of the defendants.

## II. *Part Two—Damages*

(104) *Eazor Express v. Teamsters*, 520 F.2d 951 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976) makes clear that plaintiffs must establish, by a preponderance of the evidence, that they sustained losses "with reasonable certainty both as to fact and amount." Thus we turn to the question of the damages recoverable by plaintiffs pursuant to our finding of liability under Section 303 of the Labor Management Relations Act.

■ (105) We find that plaintiffs have established by a preponderance of the evidence that the money they expended for out-of-pocket expenses, such as for security guards, damages to property and counsel fees, was fair, reasonable and necessary in the following amounts:

| | |
|---|---|
| (A) C & K Coal Co. | $110,849.00 |
| (B) Cambria Coal Co. | 175,477.00 |
| (C) Shannon Coal Co. | 74,955.00 |
| (D) Stahlman Coal Co. | 43,352.00 |
| (E) Vantage Coal Co. | 21,779.00 |
| TOTAL ALL COMPANIES | $426,412.00 |

(106) We find by a preponderance of the evidence that the foregoing expenditures may be dissected as follows:

(A) C & K Coal Company paid $98,881 for security guards, $9605 for attorneys fees and $2093 for repairs to property, for a total sum of $110,849;

(B) Cambria Coal Company paid $167,941 for security guards, $6,411 for counsel fees and $1125 for repairs to property, for a total sum of $175,477;

(C) Shannon Coal Company paid $64,822 for security guards and $10,133 for counsel fees, for a total sum of $74,-955;

(D) Stahlman Coal Company paid $37,355 for security guards and $5,997 for counsel fees, for a total sum of $43,-352; and

(E) Vantage Coal Company paid $18,677 for security guards and $3102 for counsel fees, for a total sum of $21,-779.

(107) Defendants argue that the sums expended by plaintiffs for security were unnecessary. The evidence is otherwise. Plaintiffs' experience indicated that the prudent course was to prepare for the worst, including prior to and following the strike. Their judgment was vindicated. Not only were they confronted with an invasion of their facilities on Dec. 12, but the trespasses, threats, damage and harassment continued on a hit and run basis at some locations, and on continuous basis at others throughout the strike. The fact that security was maintained prior to and following settlement of the strike, we find was necessary due to a legitimate concern that damage would occur to their facilities. Plaintiffs are non-union companies operating in an organized area and plaintiffs had prevailed in a hotly contested certification election in 1976. Thus these factors coupled with their prior experience, required retention of security both prior to and following the strike.

(108) We have also carefully reviewed the sums paid by plaintiffs for counsel fees and for damage to their property which are set forth in plaintiffs' Ex. 387 and International Ex. I at page 24, and supporting documents. They have been corroborated by credible evidence which established by a preponderance of the evidence that the losses were proven "with reasonable certainty both as to fact and amount." The sums paid were fair, reasonable and necessary and directly attributable to the conduct of those defendants on whom liability has been posited.

(109) The issues of lost profits from inventory available for shipment and lost profits from lost production were hotly contested. The difficulty in computing damages relating to fungible goods in a continuous production enterprise is evidenced by the disagreement of two competent expert witnesses. We note also that the record contains grist for every party's mill because plaintiffs earned income before taxes was $12,876,948 in 1977 but increased to $18,-039,328 in 1978, despite recording an alleged

loss on its books of $1,039,276 for December 1977 and a loss of $421,738 for January 1978. Income for November 1977, one month prior to the strike was $1,081,654 and the income for February 1978 was $1,209,089, or $102,000 higher than February 1977. The income for March 1978, again during the strike period, was $1,840,158 or $885,486 higher than March of 1977.

(110) Our task is made more difficult because to paraphrase former Judge Friedman of the Court of Appeals—where you begin often determines where you come out. The base period for income comparison purposes is important. But it too is not conclusive. For example, plaintiffs' consolidated income for the precise period in the previous year was as follows: December 1976—$206,011; January 1977—$118,637; February 1977—$1,107,812; and March 1977—$954,672. This total is substantially less than the $4.2 million dollars claimed by plaintiffs in this case. Weather and the holiday season are also variable factors from year to year.

■■■ (111) Turning to the claim for lost profits from inventory available for shipment, we find that plaintiffs have failed to establish by a preponderance of the evidence that they sustained any actual damage due to the acts of defendants. The evidence preponderates that the inventory was sold to others at a figure in excess of the contract and spot prices set forth in Ex. 381–9 at page 2, and Ex. 381–76 at page 2. There was insufficient credible evidence of both the fact and the amount of any damage.

(112) To be sure plaintiffs were required to exercise the force majeure clause in their contracts with contract customers (Ex. 230–9) due to defendants' conduct. They are entitled to recover if they sustained any damage. But we find they did not. Plaintiffs admit that the inventory of 129,254 tons available for shipment in December was subsequently sold. We find that the evidence establishes that when sold the price per ton was substantially higher than the contract price due to the paucity of coal on the market.

■■ (113) The proper measure of damages, under the circumstances, is the difference between the selling price plaintiffs failed to receive and the amount they actually received. Plaintiffs sold over 129,254 tons of coal in the first quarter of 1978 at an average price of $26.41/ton, thereby displacing the inventory on hand in December. They had contracted to sell the inventory of 129,254 tons at $23.65/ton. Thus we reject plaintiffs argument that the sales were lost forever. Plaintiffs sold this tonnage as they had a right to do under Section 2–703 of the Uniform Commercial Code, 12A P.S. § 2–703 et seq., in good faith and in a commercially reasonably manner and they suffered no loss.

(114) We also find that plaintiffs had a duty to mitigate damages and they did so in January and February of 1978. The case of Hughes v. Chesapeake & Ohio Coal Co., 269 F. 589 (3d Cir. 1921) is distinguishable. There "the plaintiff vendor was prevented by the defendant's breach from selling this quantity of coal to anyone else" due to unlimited capacity to produce. Id. at 591. Here plaintiffs sold the tonnage to other customers and as evidence of their limited production capacity they declined a specific offer from American Electric Power Company to purchase all the coal in the inventory on or about December 31, 1977. Alternatively we find that plaintiffs declination constitutes an unreasonable failure to mitigate damages as required by Section 303. See generally, Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446, 458 (5th Cir. 1970).

(115) We also reject defendants' evidence that the customers set forth at page 9 of Ex. I are the specific customers to whom the coal was sold. There is no credible evidence to support this assertion, and we reject defendants' entreatment to assess plaintiffs with a specific gain of $357,114. Suffice to say we have found that plaintiffs subsequently sold the inventory available for shipment, as they concede, and they did so during a rising market. Plaintiffs claim for damages for lost profits available for shipment will be denied. To hold otherwise would be speculation.

(116) The issue of lost profits from lost production was addressed by two competent expert witnesses. There is apparently no precise basis for a determination of this question because the base period that is used, coupled with methodology, generates divergent conclusions. Much of the evidence was theoretical and opinion in character. Credibility is a large factor because the books and records speak in many tongues.

██ (117) We find that plaintiffs have suffered a loss of $908,333 in profit from lost production. We find the analysis, report and testimony of Robert Courson to be more credible than the testimony of plaintiffs' expert. Our finding is based on the starting point that plaintiffs' lost production during the strike period totalled 137,835 tons. We find that the lost production on a tonnage basis is more properly determined by comparing the clean coal produced for the first six months of 1977 and the last six months of 1978 with the actual production for the twelve-month period of July 1977 through June 1978. This comparison permits an accounting for all twelve months in both the base and strike periods, thereby eliminating seasonal adjustments while treating the benefits to plaintiffs from mining activities during the strike period which did not result in coal removal during the same period.

(118) Plaintiffs produced 3,824,949 tons during January to June 1977 and July to December 1978, excluding Stahlman. Defendants' Ex. I at p. 12. Plaintiffs produced 3,687,114 tons of coal from July 1977 to June 1978. Production decreased therefore by 137,835 tons of clean coal during the strike period.

(119) We next subtracted the variable production costs saved of $16.13 from the selling price of $22.72/ton to obtain the adjusted loss per ton to plaintiffs of $6.59. Plaintiffs sustained a loss of $908,333 based on an adjusted loss of $6.59/ton for 137,835 tons of coal. We adopt as the findings of the court the calculations beginning at page 12 of defendants' Exhibits I and N.

(120) All parties agree that a recovery credit must be deducted from the lost profits for lost production. We agree with the reasoning of defendants' expert witness and find that the recovery credit is $170,281. The total lost profits for lost production for all companies is $738,052.

(121) On an individual company basis, we award the following sums for lost profit from lost production:

(A) C & K Coal Co.

| | | |
|---|---|---|
| Lost profit from lost production: | $349,963 | |
| Less Recovery | 65,606 | 284,357 |

(B) Cambria Coal Co.

| | | |
|---|---|---|
| Lost profit from lost production: | $183,801 | |
| Less Recovery | 34,456 | 149,345 |

(C) Shannon Coal Co.

| | | |
|---|---|---|
| Lost profit from lost production: | $200,830 | |
| Less Recovery | 37,649 | 163,181 |

(D) Vantage Coal Co.

| | | |
|---|---|---|
| Lost profit from lost production: | $173,739 | |
| Less Recovery | 32,570 | 141,169 |
| TOTAL ALL COMPANIES | | $738,052 |

(122) We find that plaintiffs have established by a preponderance of the evidence that each company sustained the following actual damages:

(A) C & K Coal Co.

| | | |
|---|---|---|
| Out-of-pocket expenses: | $110,849 | |
| Add lost profit from lost production: | 284,357 | 385,206 |

(B) Cambria Coal Co.

| | | |
|---|---|---|
| Out-of-pocket expenses: | 175,477 | |
| Add lost profit from lost production: | 149,345 | 324,822 |

(C) Shannon Coal Co.

| | | |
|---|---|---|
| Out-of-pocket expenses: | 74,955 | |
| Add lost profit from lost production: | 163,181 | 238,136 |

(D) Vantage Coal Co.

| | | |
|---|---|---|
| Out-of-pocket expenses: | 21,779 | |
| Add lost profit from lost production: | 141,169 | 162,948 |

(E) Stahlman Coal Co.

| | | |
|---|---|---|
| Out-of-pocket expenses: | 43,352 | |
| Add lost profit from lost production: | -0- | 43,352 |
| TOTAL ALL COMPANIES | | $1,164,464 |

██ (123) Plaintiffs contend that the facts of record require an award for prejudgment interest. We agree. The rule in this jurisdiction empowers a district court to exercise its discretion in this regard. *Eazor Exp. v. Teamsters*, 520 F.2d at 973–974. Our decision to award interest on an unliquidated damage claim is predicated on several factors. First, there is no dispute that

plaintiffs lost profits and expended substantial sums to protect their interests during the strike. They have lost the use of that money for a considerable period of time. Second, the language of the Labor Management Relations Act and the teachings of the Supreme Court make clear that neutral employers are off limits to labor organizations with whom they have no dispute. Third, Districts 5 and 2, and the four local unions, instituted illegal secondary conduct with full knowledge that their activities were illegal, despite the availability of experienced labor counsel. Fourth, the actions here were not the isolated acts of disgruntled members who could not be controlled as during a wildcat strike. Defendants orchestrated an attempt to close the business of plaintiffs during the strike period. Fifth, we can only infer that defendants assumed that some day they would be required to fully compensate plaintiffs for their losses and that day is at hand.

(124) We award to plaintiffs pre-judgment interest on the sum of $1,164,464 from March 1, 1978 to March 17, 1982 at the rate of 6 percent per annum. That figure totals $282,725 for a total award to plaintiffs on all claims of $1,447,189.

(125) In sum we award to the individual companies the following damages:

(A) C & K Coal Co.

| | | |
|---|---:|---:|
| Out-of-pocket expense: | $110,849 | |
| Lost profit from lost production: | 284,357 | |
| Pre-judgment interest: | 95,954 | $491,160 |

(B) Cambria Coal Co.

| | | |
|---|---:|---:|
| Out-of-pocket expense: | $175,477 | |
| Lost profit from lost production: | 149,345 | |
| Pre-judgment interest: | 78,865 | $403,687 |

(C) Shannon Coal Co.

| | | |
|---|---:|---:|
| Out-of-pocket expense: | $ 74,955 | |
| Lost profit from lost production: | 163,181 | |
| Pre-judgment interest: | 57,818 | $295,954 |

(D) Vantage Coal Co.

| | | |
|---|---:|---:|
| Out-of-pocket expense: | $ 21,779 | |
| Lost profit from lost production: | 141,169 | |
| Pre-judgment interest: | 39,563 | $202,511 |

(E) Stahlman Coal Co.

| | | |
|---|---:|---:|
| Out-of-pocket expense: | $ 43,352 | |
| Lost profit from lost production: | -0- | |
| Pre-judgment interest: | 10,525 | $ 53,877 |

| | |
|---|---:|
| TOTAL ALL COMPANIES: | $1,447,189 |

■ (126) Since we have found that plaintiffs have failed to establish any tort claim based on state law, no punitive or exemplary damages may be recovered. Moreover since Section 303 of the Taft-Hartley Act speaks only of compensation for actual losses, a similar result must follow under federal law. *Local 20, Teamsters, Chauffeurs and Helpers Union v. Lester Morton*, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).

■ (127) The question arises in these proceedings as to whether the court should apportion damages. Assuming that this court has the power to do so under Section 303 and federal law, the apportionment of damages would be inappropriate in this case. As we have found, the conduct of the defendants on whom liability has been posited occurred from the outset. Indeed, the direction and authorization of illegal secondary activity by these labor organizations coincided with the commencement of the UMW strike and in some cases pre-dated it. Their acts were coordinated, similar, consistent and indistinguishable. To attempt to apportion damages would be impossible because the conduct of one organization did not exceed the conduct of the others. The acts were authorized and jointly performed on a mass basis at the direction of all defendants. The judgment we will docket will impose joint and several liability on the labor organizations that have been found to be liable.

■ (128) In finding number 102 we alluded to the state law tort claims for trespass against the individual defendants. There is evidence that Paul D. Michel, Lindsay R. Cleaver, Norman Connor, Amerigo De Pellegrin, Thomas Eshenbaugh, Jeffrey L. Lash, Audley Montgomery, Robert J. Riggatire, Charles E. Ponce, Robert J. Matter, Frank J. Nemeth and Joseph Miller were present on plaintiffs' property at various times during the strike. Assuming for the sake of argument that plaintiffs have established by clear proof that these defendants intentionally intruded upon land owned by plaintiffs, we find that plaintiffs have failed to establish by a preponderance of the evidence, and plainly not by clear proof, that these defendants caused any

actual damage. Plaintiffs have established at most liability without proof of damages.

(129) Plaintiffs bear the burden of proving that the trespass was the legal cause, i.e., a substantial factor in bringing about actual harm or damage in order to recover from any one of these alleged tortfeasors. Pennsylvania law provides that when a plaintiff proves a violation of a legally protected interest but fails to prove that any injury or damage resulted only nominal damages may be recovered. 11 P.L.E. Damages § 3. We find that plaintiffs would be entitled to recover, at most, the sum of $1.00 against the individual defendants, assuming that our previous finding of want of clear proof of the tort of trespass is erroneous.

(130) The foregoing shall constitute findings of fact and conclusions of law as required by Rule 52(a) and a separate judgment order will be filed forthwith.